An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-825

Filed 1 July 2026

Cumberland County, Nos. 21CRS053479-250; 21CRS053480-250

STATE OF NORTH CAROLINA

       v.

ANDREW MALIK WELLS

Appeal by Defendant from judgments entered 21 June 2024 by Judge James S. Carmical in Cumberland County Superior Court. Heard in the Court of Appeals 24 March 2026.

> *Attorney General Jeff Jackson, by Assistant Attorney General Yvonne B. Walker, for the State.*
>
> *Marilyn G. Ozer for the Defendant.*

WOOD, Judge.

Andrew Malik Wells ("Defendant") appeals from judgment entered upon jury verdicts finding him guilty of first-degree murder and possession of a firearm by a felon. Defendant argues the trial court abused its discretion by sustaining the State's objection to questions on cross-examination of an expert witness. After careful review of the record and applicable law, we hold Defendant received a fair trial free from

error.

## I.    Factual and Procedural Background

On the evening of 22 April 2021, Officers of the Fayetteville Police Department responded to a 911 call reporting an individual had been shot inside of a residence on Newark Avenue.  When Officers arrived, Defendant answered the door with a video game controller in his hand.  Officers asked Defendant where the individual who had been shot was, to which Defendant responded that nobody there was shot.  Officers proceeded to check the house to ensure no one had been shot.  Defendant "really didn't take no action" and "was cool, calm, and collect[ed] throughout the entire process."

Officer Franklin stayed with Defendant while Officers Freeman and Locklear searched the house.  As they exited the kitchen, they noticed blood on the floor and on the closed bathroom door.  In the bathroom, Officers found Cal Isaiah Daniel Drumgoole ("Drumgoole") deceased in the bathtub and covered in blood.  Officer Locklear later testified that when he watched his body camera footage, he heard a "chuckle" and stated it "could only have been the defendant chuckling in the background as we were pulling the body out" of the bathtub.  On 16 May 2022, Defendant was indicted on the charges of first-degree murder and possession of a firearm by a felon.

Witness testimony tends to show the following events leading up to and after the shooting. On 22 April 2021, Derriyus Washington ("Washington"), Latia Oliver ("Oliver"), Washington's girlfriend, and Defendant were hanging out at Washington's

home on Newark Avenue. Around 7 to 8 p.m. that night, Drumgoole arrived while everyone was playing video games, smoking weed, and drinking alcohol. Shortly after Drumgoole's arrival, Washington sent Oliver to the store for more beer and cigarettes. A few minutes after Oliver left, Drumgoole got up to use the bathroom and Defendant went to the kitchen. Washington testified on direct examination that from the room where they were playing video games,

> [WASHINGTON]: . . . I could hear the toilet flush so I look up. I was putting out - - I was putting out like blunts and stuff in the ashtray and as - - after the toilet flushed I could hear water running like as if he was washing his hands in the sink.
>
> . . . .
>
> [WASHINGTON]: So as the - - like, once I heard the water stop running, you know what I'm saying, the door opened and [Defendant] was coming from out of the kitchen. Also coming, they both were basically coming back to the room.
>
> [STATE]: Right. And what happened then?
>
> [WASHINGTON]: And then in a little, you know, [Drumgoole] is coming. When before he gets to the door, [Defendant] comes to the side and he looks and he makes eye contact with me and then he looks, you know what I'm saying, he looks back and then he shoots [Drumgoole].

After he shot Drumgoole, Defendant asked Washington if he was alright and if he was scared, which unsettled Washington. Washington walked over to Drumgoole and could see he was not breathing; Defendant stood behind Washington and made comments to him "like, wrap him up, gang . . . like crazy comments . . . he told me to, like, call the guys . . . wrap him up, as if I had somebody . . . a cleanup crew on retainer

or something like that. To come and, I guess, rid - - rid of [Drumgoole]." Defendant tried to get Washington to pick up Drumgoole and put him in the bathtub while repeating the comment "wrap him up." Defendant eventually helped Washington "scoop" Drumgoole into the bathtub. Washington did not see Defendant with a gun prior to the shooting.

Defendant and Washington proceeded to mop up the blood for a minute before Defendant tossed the mop aside and suggested they go back to playing video games. Washington claimed he tried to "play cool" because he knew Oliver would be returning from the store soon and stated Defendant did not seem bothered by what had happened.

Oliver returned to the house, but Washington was able to stop her before she came through the door, preventing her from seeing the blood. Washington and Defendant joined Oliver outside, where she became upset because she did not understand what was going on. Washington claimed Defendant "kept saying to me that I had to shoot [Drumgoole] too," and so he implied to Defendant that "we could go ahead and handle that" in an attempt to get him to hand over the gun and head back towards the house, away from the car and Oliver. Washington gained possession of the gun, pointed it at Defendant, and began to yell until Defendant ran around the back of the house. Washington had Oliver get into the driver's seat of the car while he went back inside to get his extra car keys and his dog before leaving in the car with Oliver. Washington told Oliver what happened and she called 911

approximately thirty to forty-five minutes later. Thereafter, they returned to the house to hand the gun over to police. Washington admitted to being somewhat impaired that day because he had been drinking, smoking weed, and had considered leaving town and running away prior to the decision to call 911.

Medical Examiner Dr. Susan Venuti ("Dr. Venuti") performed an autopsy, recovered the bullet, and confirmed that Drumgoole died from a gunshot wound to the head. Dr. Venuti described the wound as an "intermediate range gunshot wound" based on the stippling; "the muzzle of the gun is between a few inches to a few feet" away when stippling is present. Forensic Scientist Andrew Walker testified about DNA on the alleged murder weapon,

> The DNA profile obtained from a swabbing from trigger and grip of revolver is approximately 21.8 nonillion times more likely if it originated from [Defendant] and Derriyus Washington, to unknown unrelated individuals, than if it originated from four unknown, unrelated individuals.

Courtney Matthews, a firearms examiner with the Fayetteville Police Department, testified that she could not say with certainty that the gun Washington handed over to the police was the murder weapon, but she was able to produce a list of 152 firearm models that could have fired the projectile. The model of gun that Washington handed over and identified as the murder weapon was included on the list.

Sarah McLeod ("McLeod"), Forensic Supervisor with the Fayetteville Police Department forensic unit, was accepted as an expert witness in the collection and

processing of forensic evidence. McLeod testified about various samples she collected from Washington, Oliver, and Defendant on the day of the shooting including gunshot residue collection, buccal swabs for DNA, and more. On cross-examination, Defendant attempted to ask McLeod about the possibility of fingerprints being collected from shell casings even though the cartridge casings were not processed for fingerprints. Specifically, Defendant asked McLeod, "[b]ecause you've been tendered as an expert, if you had have tested those shell casings for fingerprints, they *could* have a returned fingerprint, correct?" The State objected to this question. The trial court sustained the objection and had the jury exit the courtroom to allow further discussion on the issue. The State argued that McLeod was not qualified to answer the question because it was outside the scope of the subject matter for which she had been tendered and accepted as an expert witness. Defendant disagreed, but the trial court sustained the State's objection and reasoned, "I'm not sure that it has any bearing on the case because there's -- you could argue anything in the house might have had fingerprints, you know, where [do] you stop, you know; there'd be no end to it."

On 21 June 2024, the jury found Defendant guilty of both charges, first-degree murder and possession of a firearm by a felon. The trial court sentenced Defendant to life imprisonment without parole for the charge of first-degree murder and 17 to 30 months of imprisonment for the charge of possession of a firearm by a felon to run concurrently with the life sentence. Defendant filed written notice of appeal on 24

June 2024.

## II. Analysis

Defendant argues the trial court abused its discretion by prohibiting inquiry into whether a fingerprint *could* have been recovered from the shell casing collected at the scene had the casing been subjected to fingerprint testing. Specifically, Defendant argues because the State was unable to match the recovered bullets to the alleged murder weapon, "it was prejudicial to not allow Defendant to explore with this expert the chance that fingerprints could have been lifted from the shell casing."

In contrast, the State argues the trial court did not abuse its discretion because the "issue of the fingerprint test would be speculative and irrelevant," and regardless, Defendant was not prejudiced by the exclusion of this testimony whether it was excluded in error or not. We agree.

## A. Standard of Review

"We review a trial court's ruling on the admission of expert testimony under Rule of Evidence 702 only for an abuse of discretion." *State v. Richardson*, 385 N.C. 101, 154, 891 S.E.2d 132, 176 (2023). A trial court has abused its discretion when "its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016) (cleaned up). Pursuant to Rule 702, expert witness testimony is admissible when:

> (a) If scientific, technical or other specialized knowledge
> will assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert

by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:

(1) The testimony is based upon sufficient facts or data.

(2) The testimony is the product of reliable principles and methods.

(3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a). All evidence must also be relevant in accordance with Rule 401, "[b]ut relevance means something more for expert testimony." *McGrady*, 368 N.C. at 889, 787 S.E.2d at 8. To assist the trier of fact, "expert testimony must provide insight beyond the conclusions that jurors can readily draw from their ordinary experience . . . testimony must do more than invite the jury to substitute the expert's judgment of the meaning of the facts of the case for its own." *Id.* (cleaned up). "[T]o obtain relief, a defendant must demonstrate not only an abuse of discretion by the trial court in admitting [or excluding] challenged evidence but also that there would likely have been a different result but for the admission [or exclusion] of that evidence." *Richardson*, 385 N.C. at 158, 891 S.E.2d at 179 (2023).

## B. Fingerprint Evidence Testimony by Expert Witness

Defendant argues the State tendered McLeod as an expert in the collection of forensic evidence and that she "unquestionably had sufficient expertise to be in a better position than the trier of fact to have an opinion on whether it is possible to lift fingerprints from shell casings." Defendant contends the exclusion of this evidence

was prejudicial because there was evidence that implicated Washington as an alternate shooter and had McLeod been able to "tell the jurors that fingerprints can be collected from shell casings, it would have revealed a critical hole in the State's investigation" because the DNA of both Washington and Defendant was found on the gun trigger. The State argues the trial court did not err, but regardless, Defendant has not shown the possibility of a different result had McLeod been allowed to answer the question about fingerprints.

To show prejudicial error, a defendant bears the burden to show that "there is a *reasonable possibility* that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *State v. Neal*, 267 N.C. App. 442, 459, 833 S.E.2d 367, 379 (2019) (quoting N.C. Gen. Stat. § 15A-1443(a)). Defendant has not met this burden.

Prior to the sustained question, McLeod testified that the shell casings at issue were not processed for fingerprints. Further, the State had already questioned McLeod about whether she had been asked to take fingerprints off shell casings in the past:

> [STATE]: And I believe he asked concerning your expertise on being able to take fingerprints or not. Now is that an area that in your expertise as a collection person you would be asked to take fingerprints off of and in another case?
>
> [MCLEOD]: There are cases in the past where I have been requested to fingerprint or to process a unfired cartridge for fingerprints, yes, sir.

Because the admitted testimony regarding fingerprints and shell casings would have allowed the jurors to easily conclude that had the shell casings been tested, they *could* have returned a fingerprint, Defendant was not prejudiced by the trial court's exclusion of the question at issue. Additionally, the jury was presented with other evidence tending to implicate Washington as an alternate shooter including: (1) Washington fled the scene of the crime before calling 911; (2) Washington testified to helping move Drumgoole's body into the tub; (3) Washington was in possession of the alleged murder weapon; and (4) Washington's DNA was on the trigger and grip of the alleged murder weapon. Therefore, we conclude Defendant has not established a reasonable possibility that the jury would have returned a different verdict had Defendant been able to question McLeod about fingerprints on the shell casings.

## III. Conclusion

For the foregoing reasons, we conclude the trial court did not abuse its discretion, but regardless, such an error would not have constituted prejudicial error. Thus, we hold Defendant received a fair trial free from error.

NO ERROR.

Chief Judge DILLON and Judge GRIFFIN concur.

Report per Rule 30(e).